**George and Mary DALY et al.,**
**Plaintiffs,**

**v.**

**John A. VOLPE, as Secretary of Transportation, et al., Defendants.**

**Civ. No. 9490.**

United States District Court,
W. D. Washington.

May 20, 1974.

Irving Clark, Jr., J. Richard Arambu-ru, Seattle, Wash., for plaintiffs.

Slade Gorton, Atty. Gen., of Wash., Thomas R. Garlington, Asst. Atty. Gen., Robert R. Rutledge, Regional Counsel, Federal Highway Administration, Portland, Or., Stan Pitkin, U. S. Atty., Albert E. Stephan, Asst. U. S. Atty., Charles Secrest, Asst. Atty. Gen., of Wash., for defendants.

## MEMORANDUM OPINION AND ORDER

GORDON THOMPSON, Jr., District Judge, Sitting by Designation.

### INTRODUCTION

This is another of the growing myriad of cases involving the construction of I-90, an interstate highway through the state of Washington. The segment involved herein would create a multiple lane bypass of the community of North Bend, Washington. Plaintiffs, individual residents and property owners in or near the proposed highway corridor, originally brought this suit in the Western District of Washington in February of 1971. The matter was assigned to the court of the Honorable William Beeks but is now before this court as a result of his assumption of senior status. The questions at issue are essentially based upon a challenge to the adequacy of the environmental impact statement (EIS) prepared to satisfy the provisions of the National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (1973) (NEPA). It is presently before this court on defendants' motion to dissolve the injunction originally issued by Judge Beeks.

This project, now known as SR 90, Echo Lake to Tanner, was begun in the early 1950's when studies were undertaken for a new highway bypass. In 1957 the first route or corridor hearing for the project was held. The corridor presented at that proceeding generally ran adjacent to the existing highway except for a southward diversion to the west of the town of North Bend.

Further implementation of those plans was delayed until 1965 because of revised construction priorities. However, other design and corridor hearings were conducted which culminated in the rejection of the original corridor (A-3) in favor of a new route (E-3). Corridor E-3, commonly known as the south route, coincides with the originally adopted corridor A-3 from its western beginning to the vicinity of Kimball Creek Marsh. From this point, corridor E-3 turns southward from the existing highway and bypasses the town of North Bend to the south before rejoining the other proposed corridors at Tanner.

This is a class action for declaratory and injunctive relief. Plaintiffs alleged at the original hearings in 1971 that the defendants, officials responsible for federal and state highway planning, were in violation of a number of applicable laws and regulations.

At the time of the initial hearing in 1971, plaintiffs based their demands for relief on three grounds: first, that the selection of the location of the highway corridor by the Washington Department of Highways and its approval by the Federal Highway Administration was arbitrary and capricious; second, that 23 U.S.C. § 138, (1974), Preservation of Parklands, prevented the state and federal government from proceeding with the proposed highway corridor; and third, that the defendants failed to comply with the procedural requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq. (1973).

On March 31, 1972, a full opinion of the District Court was filed. Daly v.

Volpe, 350 F.Supp. 252 (W.D.Wash. 1972). Treating each of the plaintiff's issues in order, Judge Beeks first held that the selection of the location for the highway corridor was neither arbitrary nor capricious and that the final decision was eminently reasonable. Daly v. Volpe, *supra*, at 255. The court specifically stated that it was not its function to weigh the evidence de novo to decide which of the proposed alternatives was most desirable. Rather, the complexity of variables to be considered in the location of a major highway route required the court to abstain from exercising any choice of its own.

The court also rejected plaintiffs' second contention finding that 23 U.S.C. § 138 (1974), Preservation of Parklands, was not in issue in the construction of this segment. Section 138 is limited to the preservation of publicly owned property. Due to the fact that none of the land in the E–3 corridor was publicly owned, the statute precluding its use for highway construction was inapplicable. Daly v. Volpe, *supra*, at 256.

On plaintiffs' third issue, the court was compelled to agree that the defendants had failed to comply with the procedural requirements of NEPA. In rejecting the sufficiency of the state's first draft environmental impact statement, the court detailed its shortcomings:

. . . The discussion of the environmental impact of the proposed location is not acceptable; . . . adverse environmental effects should be listed and discussed in a single section of the statement, and not scattered throughout the report. The court believes that the alternatives to the proposed corridor are adequately discussed in the "Advance Planning Study," which may be incorporated by reference in the new environmental impact study. Neither report sufficiently discussed the relationship between local short-term uses of man's environment and long-term productivity. Finally, there is virtually no discussion of irreversible and irretrievable commitments of resources involved

in locating the highway in corridor E–3. Daly v. Volpe, *supra* at 258.

Accordingly, the court ordered the defendants to prepare a new draft environmental impact statement conforming to the relevant regulations, circulate it among interested agencies, and to make it available to the public prior to another public location hearing. The court also provided that:

The state shall then prepare a final environmental impact statement, append it to a compilation of the comments received, and submit these, together with a new application for approval of the state's suggested location of I–90, to the Regional Federal Highway Administrator. [Footnote omitted]. Federal defendants shall than process the application according to existing regulations. Daly v. Volpe, *supra* at 260.

The court then proceeded to enjoin the defendants from undertaking any further construction or land acquisition until the state established compliance with NEPA.

Motions were subsequently filed by defendants to amend the findings of fact, conclusions of law and judgment of the District Court under F.R.Civ.P. 52(b) and 59(a). In response to these motions, the case was reheard on June 15, 1972. Following the rehearing, the court filed an opinion on August 4, 1972. The court partially reversed its earlier position and held that:

Because of the urgency of the situation in this case, and because the alternative routes (including E–3) were clearly outlined at the September 1, 1970 hearing, defendants will not be required to conduct a new location hearing. Daly v. Volpe, *supra* at 260.

However, the court again required the defendants to prepare a new EIS, while providing that "defendants may use the impact statement filed herein as the draft impact statement."

This matter is now before this court on defendants' motion to dissolve the existing injunction. The state urges the

court to conclude that it is now in compliance with the dictates of NEPA, while plaintiffs continue to argue that the existing impact statement is still unsatisfactory.

After a thorough examination of the issues in contention and a reexamination of Judge Beeks' original opinion, this court must conclude that the defendants have fully complied with the procedural requirements of NEPA and that the injunction should therefore be dissolved.

## STANDARD OF REVIEW

In reviewing defendants' final impact statement, the court must first establish a proper standard of review.

The Administrative Procedure Act, 5 U.S.C. § 706 (1967), prescribes the scope of review. It provides:

" . . . the reviewing court shall—

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or other not in accordance with law;

\* \* \* \* \* \*

(D) without observance of procedure required by law."

Decisions issued by the Ninth Circuit Court of Appeal are divided on the question of whether subsection (A) or subsection (D) constitutes the proper standard of review. In Environmental Defense Fund, Inc. v. Armstrong, 487 F.2d 814 (9th Cir. 1973), the court applied subsection (2)(A) in its review of the defendants' compliance with NEPA's requirements. Accord, Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973), cert. denied, —— U.S. ——, 94 S. Ct. 1979, 40 L.Ed.2d 312, 42 U.S.L.W. 3595 (U. S. April 23, 1974). However, other panels have treated the question of whether an environmental impact statement complies with NEPA as a procedural question, governed by § 706(2)(D). See, Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1280 (9th Cir. 1973); Environmental

Defense Fund, Inc. v. Armstrong, *supra* at 817, fn. 7.

Irrespective of the apparent lack of agreement illustrated in decisions of this circuit, the court specifically finds, that under the circumstances of this particular case, either test would lead to the same result. Here the final impact statement has been prepared with great care and contains sufficient information upon which an informed adminstrative decision could be made under either subsection. This court's scope of review is narrow. Jicarilla v. Morton, *supra* at 1280. Even under the flexible standards of § 706(2)(D) the court may not substitute its judgment for that of the Federal Highway Administrator and must conclude, for the reasons detailed below, that the requirements of NEPA have been satisfied under either test.

## PLAINTIFFS' ATTACK ON DEFENDANTS' COMPLIANCE

Plaintiffs' essentially base their attack on defendants' compliance on three grounds:

(1) That to fully appreciate the environmental effects of this project, the defendants must prepare a comprehensive "umbrella" impact statement covering I-90 from Seattle to Snoqualmie Summit;

(2) That defendants final impact statement fails to consider existing, viable alternatives;

(3) That the North Bend impact statement fails to provide a balancing process between environmental and economic costs and benefits.

Additionally, via oral and written argument, plaintiffs have asked this court to question the need for completion of a bypass of North Bend on a scale contemplated by defendants. Recent uncertainties raised by a gasoline crisis and current litigation which will affect the completion of other portions of I-90 might suggest that this argument has merit. However, just as there is no question that an environmental impact statement for this section of high-

way is required by NEPA, there is no question that this court may not substitute its judgment for that of the Secretary in determining the necessity or desirability of this project. Lathan v. Volpe, 455 F.2d 1111, 1121 (9th Cir. 1971); Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275 (9th Cir. 1973). This court's sole function is limited to determining whether the Secretary's action followed the necessary procedural requirements.

Treating each of plaintiff's contentions in order, the court first finds that an umbrella statement is neither required by law nor desirable under the circumstances at hand. The question of the proper scope of an environmental impact statement is frequently the subject of NEPA litigation. Questions of this type normally arise in situations where portions of a larger project have been segmented and given separate NEPA considerations. The obvious problem with such a procedure is that occasionally the impact of the total project is much greater than the sum of its individual parts. Though project environmental impact statements may be appropriate for consideration of localized impacts, it is clear that the identification of broad social environmental alternatives may not be properly considered until the entire project is viewed in a comprehensive manner.

Here plaintiffs contend that the defendants have impermissibly segmented the I–90 project and in doing so, have distorted its actual effects on the environment. They argue that while project environmental impact statements may be appropriate for consideration of localized impacts, the segmentation present here renders the final EIS inadequate.

■ The defendants offer several arguments to rebut this attack. First they contend, that because the need for a comprehensive umbrella statement was not raised during the initial hearings, the doctrine of res judicata precludes plaintiffs from raising the issue now. This is not correct. The case has not proceeded to final judgment, and the applicable doctrine is therefore law of the case, not res judicata. See, 1B J. Moore, Federal Practice, ¶ 0.404 [1] (2 Ed.1965); 21 C.J.S. Courts § 195 (1940). Although the object of both rules of law is finality in litigation, the former applies only to foreclose the reconsideration of matters actually decided. Since the question of a need for a comprehensive statement was never raised in this continuing litigation, res judicata is inapplicable.

Defendants also contend that principles of equitable estoppel preclude plaintiffs from raising this issue now. Defendants argue that plaintiffs have had their day in court and could have raised the issue of the comprehensive statement during the initial proceedings. Having failed to raise this issue at the proper time, they are estopped from advancing this new argument in support of their contention that defendants have not complied with the mandates of NEPA.

■ The elements of the doctrine of equitable estoppel are well established in this circuit. The person setting up the doctrine of equitable estoppel must have been induced to alter his position in such a way that he will be injured if the other person is not held to the representation or attitude on which the estoppel is predicated. The doctrine cannot arise except when justice demands. United States Fidelity & Guaranty Co. v. Stewart's Downtown Motors, 336 F.2d 549 (9th Cir. 1964). Were this other than a case involving the public interest, the court would be disposed to find that the plaintiffs are estopped from raising the issue at this time. However, the doctrine of estoppel cannot be the means of successfully avoiding requirements of legislation enacted for the protection of the public interest. Scott Paper Co. v. Marcalus Manufacturing Co., Inc., 326 U.S. 249, 257, 66 S.Ct. 101, 90 L.Ed. 47 (1945); United States v. 111.2 Acres of Land in Ferry County, Washington, 293 F.Supp. 1042 (E.D.Wash.1968), affirmed 435 F.2d 561. Since NEPA is clearly legislation designed for the pro-

tection of the public interest, the doctrine of estoppel cannot preclude plaintiffs from raising the issue at this time.

However, irrespective of the court's holding on the procedural issues, on the merits, the final EIS fully complies with existing law and regulations.

The Federal Highway Administration has promulgated guidelines which deal with the question of proper segmentation for impact statement analysis under NEPA. These regulations are found in the Federal Highway Administration Policy and Procedure Memorandum 90-1, 37 Fed.Reg. 21809 (October 14, 1971).

Paragraph 6 of PPM 90-1 provides guidance as to the length of highway which should be included in one comprehensive impact statement:

The highway section included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope. Piecemealing proposed highway improvements in separate environmental statements should be avoided. If possible, the highway section should be of substantial length that would normally be included in a multi-year highway improvement program.

■ The first prerequisite of a suitable highway segment is the requirement that it "connect logical termini", PPI 90-1. The courts have recognized that in deciding upon logical termini some form of segmentation or piecemealing is inevitable. Thus, in Indian Lookout Alliance v. Volpe, 484 F.2d 11, 19 (8th Cir. 1973), the court stated that:

. . . [W]e think that as a practical matter it is necessary to permit the division of a state highway plan into segments for the purpose of environmental considerations. This division to some extent could correlate with present . . . piecemeal type operation.

In Citizens v. Brinegar, 357 F.Supp. 1269 (D.Ariz.1973), it was held that the reasonable division of federal aid highway projects into individual segments,

and the preparation of separate environmental impact statements for each such segment, does not, absent allegation and demonstration that such division was made clandestinely to avoid statutory requirements, violate NEPA. Here the North Bend bypass is designed to route traffic around the population center thereby relieving the current heavy level of congestion. Courts have recognized that a population center bypass is a logical highway segment which may be covered by a single EIS, though it may not be split into separate segments. See Thompson v. Fugate, 347 F.Supp. 120 (E.D.Va.1972). Here the court must conclude that, as to the first prerequisite of a suitable highway segment, the intended bypass does link logical termini. Additionally, plaintiffs have failed to offer any evidence that even remotely indicates that defendants have segmented the I-90 project to avoid NEPA.

■ A second prerequisite for a reasonable highway segment is the independent utility of such a segment. See Indian Lookout Alliance v. Volpe, *supra*, at 118. The segment at issue herein meets this test, being specifically designed as a bypass of the presently congested urban area. There can be little doubt that a bypass of North Bend would have independent utility irrespective of the eventual completion of other portions of Interstate 90.

■ The third prerequisite for determining the reasonableness of a proposed highway segment "is whether the length selected assured adequate opportunity for the consideration of alternatives required by the Act." Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731 (D.Conn.1972). Here the EIS adequately discusses proposed alternatives for the construction of a bypass. An impact statement of wider scope would in no way provide further assistance to the decision makers who ultimately have to decide on the best location for the intended bypass.

Not only does the court find that the defendants have not intentionally seg-

mented this section of the proposed I–90 to avoid compliance with NEPA, but it believes that the current structure of the EIS allows the Federal Highway Administration the best opportunity to weigh and consider the environmental effects of the project. In an EIS for such a segment permutations and combinations of different corridor alternatives within each large segment would be immense, and the inevitable inability of a highway department to combine and discuss all such myriad combinations would be a fertile ground for legal attack and would not form the basis for informed environmental decisions.

■ The seven mile North Bend bypass, in contrast, provides an excellent vehicle for the detailed consideration of specific corridor alternatives and detailed discussion of environmental impacts. Concededly, each EIS must reflect the project's impact in relation to the entire highway configuration of which it is a part but the environmental impact statement filed herein adequately performs that function.

## ALTERNATIVES

Section 102(2)(C)(iii) of NEPA, 42 U.S.C. § 4332(2)(C) (1973), requires that the EIS include a discussion of "alternatives to the proposed action." Plaintiffs contend that the environmental impact statement here fails to discuss some reasonable and feasible alternatives to the proposed action.

This issue again requires a re-examination of the doctrine of the law of the case. This results from the fact that Judge Beeks has already specifically stated that defendants' consideration of alternates was adequate.

The court believes that the alternatives to the proposed corridor are adequately discussed in the "Advanced Planning Study," which may be incorporated by reference in the new environmental impact statement. Daly v. Volpe, *supra*, at 258.

■ Prior decisions or holdings of a court in the same litigation are not res judicata. Under the doctrine of law of the case, the court can permissibly disregard or correct any prior decision or ruling which was plainly wrong, or where the application of the law of the case would work a manifest injustice. *See* 21 C.J.S. Courts § 195 (1940). Here, however, the court would certainly err in not relying on Judge Beeks' earlier decision. This precise question was passed upon by Judge Beeks when he stated that the consideration of alternatives was sufficient to conform to the requirements of NEPA. That decision was neither incorrect nor will it work a manifest injustice upon the parties in the action. Plaintiffs argue that Judge Beeks' opinion manifests an intention for ongoing consideration of highway planning in the North Bend area. It is clear that Judge Beeks desired up-to-date documents which would take factors into account which might occur after his decision in 1972. Defendants have considered all reasonable recent developments in the final environmental impact statement.

NEPA's "alternatives" discussion is subject to a construction of reasonableness. Life of the Land v. Brinegar, 485 F.2d 460 (9th Cir. 1973); Natural Resources Defense Council, Inc. v. Morton, 148 U.S.App.D.C. 5, 458 F.2d 827 (1972).

Accordingly, there is no need for an EIS to consider an alternative whose effect cannot be reasonably ascertained, and whose implementation is deemed remote and speculative. . . . Rather, the EIS need only set forth those alternatives "sufficient to permit a reasoned choice". Life of the Land v. Brinegar, *supra*, 485 F.2d 460.

This has been done.

## FAILURE TO BALANCE ENVIRONMENTAL CONSIDERATIONS WITH ECONOMIC COSTS

Section 102(2)(B) of NEPA, 42 U.S.C. § 4332(2)(B) (1973), provides that:

(2) all agencies of the Federal Government shall—

(B) identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by subchapter II of this chapter, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations; . . . .

This section was construed in Calvert Cliffs' v. United States Atomic Energy Commission, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971), to require the consideration of environmental values in the process of determining the question of whether and in what form a federal project should be completed. The court reasoned that perhaps the greatest importance of NEPA is to require governmental agencies to consider environmental issues just as they consider other matters within their mandates. "Environmental amenities" will often be in conflict with "economic and technical considerations". To "consider" the former "along with" the latter must involve the balancing process. In some instances environmental costs may outweigh economic and technical benefits and in other instances they may not but NEPA mandates a rather finely tuned and "systematic" balancing analysis in each instance. Calvert Cliffs' v. A. E. C., *supra* at 1113.

In attempting to quantify and articulate environmental considerations, highway administrators and planners are limited by the unavailability of techniques which accurately reflect the impact of a given project. While certain effects of a project can be studied and predicted in general terms in advance of construction, very few environmental considerations can be described in accurate detail with quantitative certainty before a project is completed. What is of deep concern is the absence of definitive guidelines, procedures and common denomination terms to be used in quantifying and comparing environmental values with other values.

Plaintiffs contend that the final EIS does not adequately balance these costs. They argue that the balancing effort is scattered and confused and is the result of guesswork not careful analysis. After an exhaustive review of the EIS this court finds that it cannot concur with plaintiffs' contentions. The final EIS submitted by defendants does adequately appraise the reader of the potential environmental costs of the project. It provides detailed information about each alternative and attempts to weigh the effects of each course of action. Obviously not every potential environmental consideration has been discussed. However, the key quantifiable effects of the various alternatives are included in the statement.

Courts which have considered the sufficiency of environmental impact statements have consistently realized that perfection is unattainable. Plaintiffs' demand for precise information quantifying the environmental and economic impact for every conceivable issue raised by completion of the project is, in effect, a request for articulation of unquantifiable factors.

In applying presently developed costs benefit techniques and relying heavily on citizen input, the EIS is in full compliance with § 102(2)(B) of NEPA. From the many comments attached to the EIS, it is clear that there has been full disclosure of relevant social, economic and environmental factors pertaining to the freeway. The appropriate highway planning officials have been presented with sufficient information to base an informed decision on whether to proceed with this project and on its proper location.

## CONCLUSION

The court must conclude that the defendants have satisfied their burden of establishing compliance with the procedural requirements of NEPA. Plaintiffs' arguments have not convinced this court that the final EIS fails to

conform with the letter or spirit of existing environmental legislation.

Accordingly, the existing injunction is hereby dissolved. Due to the considerable delay already experienced in this matter, this court will not entertain any requests for a further stay in the execution of this order.